IN THE UNITED STATES COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CRIM. NO.: 12-693(FAB/SCC) |
| [1] JOSÉ M. GUZMAN-DE LOS SANTOS, | |
| [3] VICTOR M. CARELA, | |
| Defendants. | |

## REPORT AND RECOMMENDATION

Co-Defendants José M. Guzman-De Los Santos and Victor M. Carela stand charged with conspiracy to distribute and possession with intent to distribute controlled substances. Docket No. 29. Each has filed a motion to suppress evidence, Docket Nos. 104, 115, both of which were referred to the undersigned by the presiding district judge. Docket Nos. 105, 116. An evidentiary hearing on the motions was held on April 3, 2013, *see* Docket No. 121; below, after laying out our findings

of fact and conclusions of law, we recommend that the motions
be denied.

## I.  Findings of Fact

At the evidentiary hearing held on April 3, 2013, the
Government presented a number of witnesses: Lead Border
Patrol Agent Luis R. Capestany, of Customs and Border
Protection ("CBP"); Special Agent Jonathan Maldonado of
Homeland Security Investigations ("HSI"); Special Agent
Carlos Martínez, also of HSI; Sgt. Angel M. Garía-Martínez of
the Police of Puerto Rico ("POPR"); and Cynthia Rivera-
Gongon, of the Yabucoa Municipal Police Department
("YMPD"). Neither defendant presented any evidence. Below,
we present our findings of fact in narrative form, explaining
our findings on points of contention where necessary.

### A.  Surveillance of the Van and the Vessel's Incursion

In the late summer of 2012, federal and state law enforcem-
ent agencies became aware of repeated attempts—many
successful—to introduce narcotics shipments via night-time
boat drops in the relatively unpopulated southeast area of
Puerto Rico. Thus, on the evening of September 16, 2012,
border patrol agents, along with agents from other agencies,
were conducting intelligence and surveillance operations in the

area of Yabucoa and Maunabo. Some CBP agents, stationed at high points that gave them a wide view of the horizon and sea, were on the look out for approaching vessels. Meanwhile, Lead Agent Capestany was driving along PR-901, a road connecting Maunabo to its northeastern neighbor, Yabucoa, while hewing close to the coast.

Around 10:40 p.m., an intelligence officer from POPR's Joint Rapid Action Force (known by its Spanish acronym, "FURA") spotted a white Ford Econoline van parked off PR-901 at a place called "El Eden." Finding the van suspicious, the FURA intelligence officer radioed Agent Capestany about it. Minutes later, the same van was seen by a YMPD officer parked at El Horizonte Restaurant. Not long after that, at approximately 11:00 p.m., the same van was seen again by the FURA intelligence officer in the parking lot of a business called "Mary's Kiosk." While driving back from an attempted intervention, Agent Capestany saw the van in that same location at approximately 11:10 p.m. The van was parked and had its lights off.

After seeing the van, Agent Capestany began to drive south on PR-901, toward Maunabo. Not long after, he turned around and headed back on the same road toward Yabucoa, when, at around 11:20 p.m., he passed the same van, which was headed

in the direction of Maunabo. Agent Capestany drove by Mary's
Kiosk again, verifying that the van was no longer parked there,
and turned back toward Maunabo. Again, he passed the van;
this time it was heading toward Yabucoa. It was 11:30 p.m.
Agent Capestany turned north again, following the van and
getting its license plate number: 887-765. Agent Capestany ran
the van's plate and found it registered to a man from Barrio
Obrero, in Santurce, PR. Findings its back-and-forth move-
ments suspicious, he also notified other CBP covert agents in
the area to stay on the lookout for it.[1]

Agent Capestany returned to his hiding spot to wait, and at
around 1:30 a.m., he was notified by a YMPD officer that the
van had been spotted again, at a place in Yabucoa called Palma
de Lucia; the van was parked under a flower bush, as if hiding.
The van was seen again by Agent Capestany at around 3:30
a.m., and it was again parked, lights out, at Mary's Kiosk.

---

**1.**   Agent Capestany also encountered two other suspicious vehicles that
evening. One was a Hyundai Elantra that he saw coming from the
direction where the drugs were ultimately recovered. When he ran its
plate, the number returned to a Mazda. Later, passing a bridge, he saw
several men running from the beach towards a red vehicle. Both times
he notified other agents to keep watch for the vehicles, but he decided
to wait rather than intervene. Neither of these vehicles were
encountered again.

Also around 3:30 a.m., agents watching the coast with night-vision equipment spotted a vessel attempting a lights-out approach to the shore. The vessel appeared headed toward Maunabo. Agent Capestany notified the YMPD, POPR, FURA, and other CBP agents in the area. He notified the Coast Guard, but it was unavailable to assist; however, a FURA helicopter was sent to intervene with the vessel, which ran aground. Three people were seen leaving the vessel.

Agent Capestany headed toward the vessel's landing spot. He drove as far as he could, but eventually the road became unmanageable and he was forced to walk. With other agents, he walked in the direction of the beach until they came across a red Ford Excursion stuck in the mud. Red gas cans were everywhere, inside and outside the truck. They searched and secured the vehicle, leaving YMPD officers with it.[2] By this time, it was approximately 4:20 a.m. On the beach, they found the vessel, but there were no people and no contraband to be found. But in a nearby creek, a FURA officer found a significant quantity of bundles of what eventually turned out to be

---

**2.** YMPD officers eventually found and arrested Co-Defendant Cecilio Mercedes-de la Cruz in the vicinity of the Excursion.

cocaine.[3] It took fifteen agents thirty minutes to load all of the bundles back onto the vessel, which was then piloted to FURA's maritime station in Humacao.

### B.  Defendant Guzmán's Arrest

At around 6:00 a.m., a border patrol agent identified the white van in a Texaco parking lot not far from where the vessel had landed.[4] A decision was made to intervene with the van's driver, who was later identified as Defendant Guzmán, but the details of the initial intervention are not clear, because the Government presented no first-person account of the encounter. Both Agent Capestany and Special Agent Maldonado testified that upon being approached by agents, Guzmán consented to a search of the van, but the Government failed to present any witness who could testify first-hand about this alleged consent. We will, therefore, disregard the testimony about consent as unreliable hearsay. Instead, we will rely primarily on the testimony of the arresting officer, POPR Sgt. García, who was at that time the Director of FURA's Maritime

---

**3.**   In total, the agents recovered 918 kilograms of cocaine.

**4.**   The distance from where the narcotics were found to the Texaco station is approximately 2.7 miles by road and 1.5 miles by air.

Division in Humacao. However, because he arrived after other agents had detained Defendant Guzmán, we make no factual findings about the circumstances of Guzmán's initial encounter with the authorities.

Early on the morning of September 17, 2013, Sgt. García was woken up by a call from FURA's operations center, which informed him of the morning's activities. He dressed and headed toward Maunabo, and while he was driving on PR-901 he received a call telling him to keep a lookout for the white van. Passing the Texaco station, he saw the van and its driver surrounded by various officers, including border patrol. Sgt. García parked his car, greeted the other officers, and began to question Guzmán. Guzmán told Sgt. García—truthfully, we note—his name and that he lived in Santurce. Asked what he was doing in the area, Guzmán said that he had come to pick up a person named Alexis, with whom he said he was going to do a construction job at a pharmacy in Humacao. However, on further questioning, Guzmán could not name the pharmacy or the person who hired him, nor could he provide a phone number for Alexis. Instead, he said that he was waiting for Alexis, who knew where they were headed. At this point, Sgt. García placed Guzmán under arrest. At the hearing, his stated

reason for arresting Guzmán at that time was because "none of [his answers to] the questions that I asked him made any sense as to the reason he was there," given "the night's events" and that he had been driving around the area for many hours. However, Sgt. García admitted that the van had never been seen violating traffic laws, nor did he see any evidence directly tying Guzmán to illegal activity, or, for that matter, to the vessel that had run ashore that morning. Guzmán was not read his *Miranda* rights until after his arrest.[5] Sgt. García then search-ed the van, but he did not find much other than a couple of mattresses and three cellular phones.

Guzmán was eventually taken to HSI's offices in San Juan, where he was interviewed by the Special Agent Maldonado.

---

5.  At the evidentiary hearing, Guzmán's attorney argued that Guzmán should have been Mirandized immediately by Sgt. García because Sgt. García considered him a "suspect." According to Guzmán's attorney, cases stating this proposition are plentiful, though he failed to provide—and we have failed to find—any. Instead, we find cases stating the opposite: "*Miranda* warnings are not required 'simply because . . . the questioned person is one whom the police suspect.'" *California v. Behler*, 463 U.S. 1121, 1125 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). When Sgt. García encountered Guzmán, he had not already decided to arrest Guzmán, and the circumstances of the interview were not consistent with a custodial interrogation. The detention appears to have been investigatory, and no *Miranda* warning was immediately necessary.

Before the interview, Guzmán signed a waiver of rights. The waiver suggests that the interview took place at about 12:30 p.m. on September 17, 2013. Nothing suggests that Guzmán's waiver was not freely and intelligently given. During the interview, Guzmán admitted to having dropped some six individuals off in the vicinity of where the vessel eventually ran ashore. He was paid to do this by a person he identified only as "Caliman," who was to pay Guzmán $5,000 for his services. After dropping the individuals off, Guzmán had been told to wait for Caliman's instructions. This story is corroborated by text-message conversations found on Guzmán's phone.[6] Guzmán signed a consent-to-search form authorizing the search of the phone. Again, nothing in the record leads us to question the consent's validity.

## C.  Defendant Carela's Arrest

YMPD Officer Cynthia Rivera was on duty on September 17, 2013. At the beginning of her shift, she had been told that a shipment of narcotics had arrived the previous night by boat and that agents were continuing to search for people who had

---

**6.**  The content of the messages is not particularly revealing, but they do suggest that Guzmán was waiting, reporting back to Caliman that things were fine.

fled from that operation. She and her partner were told to be on the lookout for these individuals.

At 3:00 or 4:00 p.m. that afternoon, Officer Rivera and her partner were driving on PR-901 from Maunabo towards Yabucoa. They were driving a black car with no roof-mounted lights. In Yabucoa, they noticed a man dressed in black attempting to hitch a ride. They pulled up alongside him, and when he noticed the patrol car's decal on its side, he jumped over a railing on the road's side and into some trees. Officer Rivera drove to level soil, called for backup, and turned back in the direction of Maunabo. They came across the man again and stopped alongside him. They asked his name, and he said it was Victor. He said he was collecting metal. Officer Rivera noticed that he was wearing black pants, a long-sleeved back shirt, and black and blue aquatic sneakers that she identified as the kind one would use for jet-ski driving. His clothing was wet.

While they were stopped, the individual, later identified as Co-Defendant Carela, asked for water. Officer Rivera gave him a bottle from the car, and he continued to talk. He said he was in the area with a person named Juan, but he couldn't answer where Juan was. Other agents arrived from the municipal and

state police. He was again asked why he was in the area, and this time he said that he had been with a boat along with several other people. He said he was going to be paid $5,000 for his participation but that he hadn't been paid yet. At this point, he was arrested and read his *Miranda* rights. Later, the police gave him more water and two empanadillas. He was found to be without any identification, and he was later determined to be in the country illegally. Throughout the questioning, Carela appeared tired but coherent, and he seemed to understand everything that was discussed.

After his arrest, Carela was eventually taken to HSI's San Juan office for an interview. Special Agent Carlos Martínez, who interviewed Carela alongside Special Agent José Lebron, testified that he again read Carela his *Miranda* rights, and the Government introduced a waiver form that Carela purportedly signed. Carela's counsel asks us to look at this form and decide that Carela did not waive his rights. Carela's counsel is right that the form is filled out in a strange manner. Special Agent Martínez testified that Carela initialed the rights as they were explained so as to indicate that he understood them. But the initials are wrong—as to some rights, a "VMC" can be made out, but as to others, the initials are incomplete or in the wrong

order, e.g., "CMV." Similarly, where the form has a space for Carela's "Name" and "Signature," the signature line is blank and the name line is difficult to decipher, though, in our opinion, it looks like an attempt at a signature: we can make out a "V," an "M," and a "C," and those letters are preceded by an "x," a symbol that often indicates a signature or a space therefor.

So, we agree that there are some oddities in the form, but we are not sure what inference Carela's counsel wishes us to draw from them. The motion to suppress does not suggest that the form was a forgery, and while counsel asked many pointed questions about the form, those questions did not offer us much of an alternative theory than what is implicitly offered by the Government: that Carela filled out the form, but he did so badly. This is the story supported by Special Agent Martínez, who testified credibly that he saw Carela fill out the form as the rights were read and explained to him. Carela did not testify, nor did he offer any other evidence to refute this version of the facts. Without an alternative narrative from Carela, we are disinclined to speculate about what the form's oddities result from, especially since the form merely memori-alizes the waiver and is not necessarily the waiver itself. *See,*

*e.g.*, *United States v. Barr*, 349 F. App'x 704, 705 (3d Cir. 2009) (referring to a waiver form as "memorializ[ing]" of the defendant's waiver of his rights); *see also United States v. Byrd*, 155 F. App'x 58, 60 (3d Cir. 2005) (holding that the failure of the police to use a form to "memorialize the [defendant's] consent" did not mean that the defendant's statement was involuntary). The form's curiosities notwithstanding, the evidence adduced at the hearing shows that Carela waived his *Miranda* rights. His demeanor, moreover, was positive and coherent, and he answered questions freely.

During the interview, Carela said that he had been hired by Co-Defendant Guzmán a few days earlier to work on a narcotics load. He said that it had been his job to refuel the vessel and he also helped offload the bales of narcotics from the vessel after it came ashore.

## II. Analysis

Because their claims rest on different factual bases, we take up the suppression motions separately. Below, we discuss Defendant Guzmán's motion before turning to Defendant Carela's.

### A. The evidence against Defendant Guzmán should not be suppressed.

Sometime around 6:00 a.m. on September 17, 2012, Defendant Guzmán was detained by authorities. This detention falls under the rubric of *Terry v. Ohio*, 392 U.S. 1 (1968), which permits a police officer, "in appropriate circumstances and in an appropriate manner [to] approach a person for the purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Id.* at 22. To justify a *Terry* stop, the officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27). We evaluate a *Terry* stop by asking whether the detaining officer had a "reasonable suspicion" that the person stopped may be involved in criminal activity. *Id.* at 7. Here, reasonable suspicion certainly existed, as officers had monitored Guzmán's van for hours as it drove aimlessly and parked randomly in the area where a large load of narcotics was delivered that same evening by boat. Thus, we see no problem with the initial detention or the questions that Sgt. García asked Guzmán.

When Sgt. García questioned Guzmán at the Texaco station about why he was in the Maunabo-Yabucoa area that night, Guzmán told him that he was waiting to pick up a person

whose number he didn't have so that they could drive to a construction job in Humacao at a business that he couldn't name. Because these answers didn't make sense to Sgt. García, he arrested Guzmán and searched his van.

Unlike the initial detention, the arrest and search need to have been supported by probable cause. This is a harder to satisfy standard than reasonable suspicion, though it is similarly nebulous. *See Illinois v. Gates*, 462 U.S. 213, 234 (1983) (noting that probable cause was not a "[f]inely-tuned" standard). Probable cause requires "more than bare suspicion." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). And whereas *Terry* stops are investigatory, probable cause requires a "fair probability" that the person arrested is engaged in criminality or that the place searched contains contraband or evidence of a crime. *Id.* at 238; *see also Safford United School Dist. No. 1 v. Redding*, 557 U.S. 364, 371 (2009) (noting that probable cause requires a "fair probability" or "substantial chance" of "discovering evidence of criminal activity"). The "substance of all the definitions of probable cause is a reasonable ground for belief of guilt, . . . and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal

citations omitted). Whether probable cause existed should be determined after taking into account the totality of all of the circumstances known to the seizing officer. *Gates*, 462 U.S. at 230–31.

Here, nothing directly tied Guzmán to any criminality, though such direct evidence is not a necessity. *See, e.g.*, *United States v. Whitner*, 219 F.3d 289, 297 (3d Cir. 2000) ("We have repeatedly noted . . . that direct evidence linking the crime to the location to be searched is not required to support a search warrant."). What the Government offers, instead, is circum-stantial evidence, derived from Guzmán's suspicious driving and evasive answers as seen through the lens of Sgt. García's experience. *See United States v. Davis*, 458 F.2d 819, 821 (D.C. Cir. 1972) (holding that probable cause should be "viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene . . . guided by his experience and training").[7] When dealing with lawful activity deemed by law

---

**7.**  However, the Court cannot simply rely on the officer's claims of expertise and his conclusions that probable cause exist. Instead, the officer must be able to articulate *why* his particular expertise led him to conclude that criminality existed in the particular circumstances of the arrest or search. WAYNE R. LAFAVE, 2 SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.2(c) (5th ed.).

enforcement to be suspicious, the cases have tended to hold that the activity, taken as a whole, must more likely than not be criminal for probable cause to exist. WAYNE R. LAFAVE, 2 SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 3.2(e) (5th ed.) (explaining that "most of the decisions on this point indicate or strongly intimate" that probable cause will only exist if the "suspicious" activity is more likely than not criminal). That is, probable cause will exist where a "succession of superficially innocent events has proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one." *United States v. Patterson*, 492 F.2d 995, 997 (9th Cir. 1974); *see also United States v. Green*, 670 F.2d 1148, 1153 (D.C. Cir. 1981) (finding probable cause where "[n]o plausible, innocent explanations for [the defendant's] sequence of behavior readily springs to mind, nor has the defendant suggested any"). The officer need not know "precisely what type of crime may have been committed" for probable cause to exist. *United States ex rel. Frasier v. Henderson*, 464 F.2d 260, 262 (2d Cir. 1972).

Guzmán's suspicious back-and-forth driving brought the agents' attention to him, and this driving—in an area that the same night saw an attempted narcotics importation—is the

strongest factor in support of a finding of probable cause for his arrest. Thus, we have reviewed a large body of case law in which probable cause findings were based in part on the defendant's suspicious driving, usually in high crime areas. The lesson that we draw from these cases is that where suspicious driving occurs alongside some other evidence pointing to the defendant's connection with criminality, courts tend to find that probable cause existed. For example, in *United States v. Korb*, the finding of probable cause was primarily based on the defendant's circuitous and evasive driving in the area of the United States-Mexico border, taken together with the agents' knowledge that a small amount of marijuana had previously been found in the vehicle. 464 F.2d 456, 457 (9th Cir. 1972) (per curiam).[8] Thus, it was the suspicious driving, combined with other evidence of criminality, that led to a

---

**8.**  The vehicle enter the United States from Tijuana. *See United States v. Korb*, 464 F.2d 456, 457 (9th Cir. 1972) (per curiam). On entry, the car was stopped and some marijuana seeds were found. *See id.* The car was allowed to enter the U.S., but was surveilled; the agents watched the car make several stops in San Diego before returning to Mexico, where it successfully evaded the agents. *See id.* It then re-entered the U.S. and was once again tailed; it again evaded the surveillance. *See id.* Eventually, it reappeared and the agents stopped and searched it, finding a duffel bag of marijuana and two guns. *See id.*

probable cause finding. *See id.*

Similarly, in *United States v. Calderon*, probable cause to search was found in part because the defendant was driving off-road near the United States-Mexico border; at one point, his vehicle was seen driving "in tandem with a pick-up truck matching the description of a truck [the defendant] owned that subsequently took a divergent path on a road known by border patrol agents as a route to circumvent the [border] check-point." 124 F. App'x 223, 224 (5th Cir. 2004) (per curiam). The defendant in *Calderon* was driving in a particularly suspicious manner with the apparent intent of secreting something over the border. The other cases we have been able to find are to similar effect. *See, e.g., United States v. Tovar*, 490 F. App'x 638, 639 (5th Cir. 2012) (per curiam) (probable cause where the defendant parked in isolated areas and where the agents had a tip that the defendant was engaged in transporting methamphetamine); *United States v. Smith*, 456 F. App'x 572, 574 (6th Cir. 2012) (probable cause where defendant engaged in suspicious driving, signed for a package known to contain heroin, and fled officers); *Watkins v. City of Southfield*, 221 F.3d 883, (6th Cir. 2000) (reasonable suspicion where defendant was driving at half the speed limit in an area where many burglar-

ies had recently been committed, and where the defendant refused to stop when he was directed to do so by the police); *United States v. Gil*, 58 F.3d 1414, 1418–19 (9th Cir. 1995) (probable cause where the defendant engaged in counter-surveillance driving and car switches, were observed the defendant making frequent deliveries of weighted bags to various locations, and frequently used pagers and public phones, and where cocaine had been recovered from a woman who had just been in the defendant's car); *United States v. Arias*, 923 F.2d 1387, 1388–89 (9th Cir. 1991) (probable cause where defendant engaged in counter-surveillance driving and where agents had information from a confidential source that the defendant was engaged in trafficking), *abrogated in part on other grounds by, LaLonde v. Cnty. of Riverside*, 204 F.3d 947 (9th Cir. 2000); *United States v. Colonia*, 870 F.2d 1319, 1326 (7th Cir. 1989) (probable cause where defendant engaged in "round-about motoring" and an informant's tip implicated him in illegal activity); *United States v. Marin*, 761 F.2d 426, 431–32 (7th Cir. 1985) (probable cause where defendant engaged in "circuitous driving," a tip implicated him in cocaine trafficking, and agents independently corroborated the tip).

The line running through all of these cases suggests that

suspicious driving alone will usually not be enough to trigger probable cause, but where the manner of driving is either particularly suggestive or is found alongside other evidence of criminality, probable cause exists: for example, with the counter-surveillance driving in *Arias* and *Gil*; the attempts to evade the authorities in *Calderon* and *Korb*; and the slow driving suggesting intoxication or "casing" in *Watkins*.

Here, Guzmán was seen driving aimlessly for an exceptionally long period of time, parking in random spots, often hidden, as under the flowers, or isolated, as at Mary's Kiosk. From at least 10:30 p.m., when he was spotted by a FURA intelligence officer, until 6:00 a.m. the next morning, when he was finally detained—more than seven hours total—Guzmán and his white van never strayed far from the area where the drugs were discovered. Only three people were seen coming off the boat, and the officers knew that more would have been needed to assist in the importation—and would need transportation to and from the Maunabo area. As Agent Capestany and his colleagues surveilled the area that night, repeatedly seeing this van, they must have thought—reasonably—that it was probably involved in transporting people or drugs as part of a narcotics importation operation. When a boat did in fact come

ashore nearby that night, carrying a large quantity of cocaine, this suspicion must have seemed confirmed. And so they stopped Guzmán, asking him what he was doing in the area. He could give no satisfying answer: he said he was picking up someone to do a construction job in Humacao, but he couldn't contact the person he was supposedly meeting, and he couldn't name the business at which he was meant to work. And of course, his explanation makes even less sense considering that Sgt. García knew that Guzmán had been driving around the relatively unpopulated area of Yabucoa and Maunabo for *nearly eight hours*.

To be sure, neither Sgt. García nor any other agent at any time saw Guzmán do anything illegal, but what the agents saw nonetheless spoke volumes: that night, nearly 1,000 kilograms of cocaine came ashore on a lights-out vessel, in the middle of the night, in a largely-unpopulated area that has few businesses or residences; that same night, for nearly eight hours, Guzmán was observed driving back and forth, occasionally parking in strange locations, along the corridor through which those drugs would necessarily be transported to the rest of the

island;[9] Guzmán was driving a type of vehicle that would be useful in transporting the drugs or people that came off the boat to elsewhere on the island; and when Guzmán was detained, he gave unbelievable explanations for his activities in the area that night. *See United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) ("[T]he mere existence of innocent explanations does not necessarily negate probable cause."); *United States v. Muñiz-Melchor*, 894 F.2d 1430, 1438 (5th Cir. 1990) ("A succession of otherwise 'innocent' circumstances or events . . . may constitute probable cause when viewed as a whole."). Looked at as a whole, "[n]o plausible explanations for this sequence of behavior readily spring to mind, nor has the defendant suggested any" that ring true. *Green*, 670 F.2d at 1153. Instead, the totality of the circumstances leads us to a conclusion that here, an "innocent course of conduct was substantially less likely than a criminal one." *Patterson*, 492 F.2d at 997. Probable cause existed to arrest Guzmán and, for the

---

**9.**  By this we mean that to leave the Yabucoa-Maunabo area where the vessel came ashore, the drugs would necessarily have to travel along PR-901.

same reasons, to search his vehicle.[10] We therefore recommend that the motion to suppress be denied.

## B.  The evidence against Defendant Carela should not be suppressed.

When officers came upon Carela, they had been told of the previous night's events and were on the lookout for individuals who had fled the vessel. Carela was wet and walking along a fairly remote road, and when he noticed the police, he fled into the bushes. This all, taken together, easily gave the police the reasonable suspicion necessary to initiate a *Terry* stop, which they did.

Once stopped, Carela made admissions that tied him to the vessel found the previous night: he said that he had been working with a boat, had been promised $5,000.00 for his help,

---

**10.**  In an informative motion, the Government contends that the presiding judge has already settled the matter of probable cause to arrest Guzmán. Docket No. 119. We disagree. During a de novo bail hearing, the presiding judge stated that there was "sufficient suspicion for probable cause to stop the van." Docket No. 80, at 83. We do not think this statement inconsistent with our report and recommendation because it mentions only the *stop* of Guzmán's van, not his subsequent arrest or the van's search. Moreover, we take the presiding judge's referral order to mean that we have a duty to consider the entirety of the motions referred to us, making recommendations based on the evidence as we heard it and the law as we find it.

and hadn't been paid yet. At this point, the officers arrested Carela, and given his admissions, the arrest was well supported by probable cause: the previous night, a boat full of cocaine had arrived on the nearby shore; the police knew that several individuals helped offload cocaine from that boat, though they had caught only one of them; Carela was found not far from the place the boat landed, wet and dressed in all black; he admitted to having been working with a boat; for this work, he was to be paid $5,000.00; he was alone, hungry, thirsty, and seemed not to know his surroundings. That Carela was probably associated with the vessel carrying the cocaine was not a very difficult inference for the officers to have made.

As for the statements that Carela made to federal agents after his arrest, as we have said, they appear to have come after he was read his *Miranda* rights, and there is nothing in the record suggesting coercion or the agents taking advantage of him. Accordingly, we recommend that his motion to suppress be denied.

### III.    Conclusion

For the reasons stated above, we RECOMMEND that the motions to suppress filed by Defendants Guzmán, Docket No. 104, and Carela, Docket No. 115, be DENIED.

IT IS SO RECOMMENDED.

The parties have until April 10, 2013, to file objections to this report and recommendation. Docket No. 105. Failure to file the same within the specified time waives the right to appeal this report and recommendation. *Henley Drilling Co. v. McGee*, 36 F.3d 143, 150-51 (1st Cir. 1994); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 8th day of April, 2013.

<u>S/ SILVIA CARREÑO-COLL</u>

UNITED STATES MAGISTRATE JUDGE